FILED
2012 Apr-26  PM 12:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SECURITAS SECURITY SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action Number **5:12-cv-00690-AKK** |
| JAMES WHITT, d/b/a Security Associates of Alabama, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The court has before it Plaintiff Securitas Security Services USA, Inc.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunctive Relief, docs. 2 & 15, requesting an emergency hearing, which the court held on March 28, 2012, and Defendant James Whitt's ("Defendant") Motion to Dismiss on March 27, 2012, for lack of subject matter jurisdiction, doc. 19. For the reasons stated below, the court will **DENY** the motion to dismiss and will **GRANT** Plaintiff's motion for injunctive relief.

## A.    Subject Matter Jurisdiction

Since Defendant challenges this court's jurisdiction, the court must first

address Defendant's motion to dismiss, doc. 19, to ascertain whether it has jurisdiction over this action.  Federal courts are courts of limited jurisdiction, with the power to hear only cases authorized by the Constitution or by statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  In cases involving diversity jurisdiction, district courts only have subject matter jurisdiction if the amount in controversy exceeds $75,000.  28 U.S.C. §§ 1331–1332.  It is this jurisdictional amount that Defendant challenges.  Specifically, Defendant contends that "nothing in Plaintiff's Complaint supports the allegation that the amount in controversy exceeds $75,000."  Doc. 19 at 2.

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Viacom, Inc., v. Zebe,* 882 F. Supp. 1063, 1064 (S.D. Fla.1995) (quoting *Hunt v. Washington State Apple Advertising Com'n,*, 432 U.S. 333, 347 (1977)).  Therefore, "[t]he value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested."  *Viacom,* 882 F. Supp. at 1064.  Additionally, in determining the amount in controversy for injunctive relief, claims for potential as well as past competitive losses are included.  *Id*., at 1064-65.

Based on its review of the pleadings and the parties' respective arguments

in their briefs, the court agrees with Plaintiff that the amount in controversy is satisfied because the "loss profits and customer goodwill associated with customer service by [Plaintiff] . . . have a value far exceeding the $75,000 threshold for this courts jurisdiction." Doc. 24 at 3.  It is undisputed that Defendant is currently providing, or plans to provide, security services to Cullman Yutaka Technologies ("Yutaka"), Heat Transfer Products Group ("HTP"), and Nichols Aluminum ("Nichols").  Docs. 2 at 3, 21 at 5-6.  All three are former clients of Plaintiff that Defendant serviced during his last year of employment with Plaintiff.  Doc. 23, at 30-31.  Moreover, Defendant is providing service to these three companies despite a non-compete agreement that prohibits him from "provid[ing] security services, directly or indirectly, individually or for another entity, to any person, customer or client which [Defendant] serviced during the last year of Employee's employment with Securitas . . . ."  Doc. 1 at 24.  Furthermore, in addition to these three companies, Defendant is also allegedly soliciting Plaintiff's other clients.  Doc. 1 at 10.

Although the Complaint failed to specifically allege $75,000 in damages, it is a given that Plaintiff has lost revenue from the Yutaka, HTP, and Nichols contracts.  Moreover, Plaintiff stands to lose additional revenue if Defendant succeeds in his attempt to obtain more of Plaintiff's business.  Significantly,

because courts consider claims for potential and competitive losses in determining the amount in controversy, "it has not 'been overly difficult in the past for federal courts to find the requisite jurisdictional amount in actions brought to enforce covenants not to compete,'" doc. 24 at 5 (quoting *Premier Industrial Corp. v. Texas Industrial Fastener Co.,* 450 F.2d 444, 446 (5th Cir. 1971)), especially where, as here, the loss of business is not speculative. After all, it is undisputed that Defendant is servicing three of Plaintiff's previous clients and has announced an intent to provide services for others who decide to engage his company. Moreover, in addition to the lost revenue, Defendant's actions also impacted the goodwill Plaintiff has garnered over the years, further adding to Plaintiff's losses. *See Eze v. Am. Equip Leasing, LLC*, No. 6:11-cv-1213-Orl-22DAB, 2011 WL 4481436 *4 (M.D. Fla. Sep. 27, 2011) (holding that "an interest in the loss of goodwill from . . . sales, and that 'the potential injury of allowing . . . sales to flourish does raise the amount in controversy well beyond the actual sales made by Defendant.'"). Therefore, the court finds that the $75,000 amount in controversy is satisfied. Accordingly, the motion to dismiss is **DENIED**.

## B.   MOTION FOR INJUNCTIVE RELIEF

The court turns now to Plaintiff's motion for injunctive relief, and the relevant facts that are at the core of this dispute.

### 1.    FACTUAL BACKGROUND

Plaintiff provides security services to Fortune 1000 companies in a wide variety of industries and services, such as uniformed security officers, patrols and inspections, access control, concierge and reception services, security console operators, alarm response, and specialized client requested services.  Doc. 1 at 3; Tr. 13.  Plaintiff negotiates rates individually with each client for the scope of its services.  Doc. 1 at 3.

On April 4, 2002, Defendant began his employment with Pinkerton's Inc., as a Human Resource Specialist.  *Id.*  Defendant became an employee of Plaintiff in 2003 when Pinkerton and several other companies merged to form Securitas.  *Id.*  In 2004, Plaintiff promoted Defendant to Branch Manager of its Hunstville, Alabama location.  *Id.*  As a Branch Manager, Defendant's responsibilities included: "developing relationships with current and prospective customers of [Plaintiff] in northern Alabama, for selling [Plaintiff's] services to those customers, and for managing [Plaintiff's] relationships with those customers."  *Id.* at 4.  During the course of Defendant's employment, Plaintiff introduced Defendant to numerous customers, including but not limited to, Yutaka in Cullman, Alabama, HTP in Scottsboro, Alabama, and Nichols in Decatur, Alabama.  *Id.*  Additionally, to help Defendant cultivate relationships with

Plaintiff's clients, Plaintiff contends it reimbursed Defendant for more than $89,000 in alleged business and marketing expenses. *Id.*

As it relates to this lawsuit, Plaintiff contends that it provided Defendant with trade secrets and other confidential information, such as pay rates, bill rates, markups, and profitability on accounts, to help Defendant develop relationships with Plaintiff's clients. *Id.*; Tr. 16. Allegedly, Plaintiff maintains the trade secrets and the other confidential information at "considerable cost and effort to [Plaintiff] using information gleamed from its long-term relationships with its customers." Doc. 1 at 5. To protect its confidential information, Plaintiff required Defendant to sign a Non-Disclosure/Non-Competition/Non-Solicitation Agreement (the "Agreement") on March 23, 2010. *Id.* In the Agreement, Defendant promised that for a year following his employment he would not compete with or solicit Plaintiff's clients or potential clients that he serviced during his last year of employment or provide security services within a fifty mile radius of the Hunstville branch office he managed for Plaintiff. *Id.* at 6. Specifically, the Agreement states:

> 2.2 Non-Competition: The parties agree that Employee may be employed with other security companies after termination of Employee's employment with Securitas USA. However, because of Employee's receipt and use of confidential information . . . Employee agrees that, during Employee's employment, and for a

period of one (1) year following Employee's last date of employment with Securitas USA, Employee will not:

a)      provide security services, directly or indirectly, individually or for another entity, to any person, customer or client which Employee serviced during the last year of Employee's employment with Securitas USA and/or

b)      provide security services, directly or indirectly, individually or for another entity, to any person, customer or potential client within a fifty (50) mile radius of the office in which Employee was based during his/her employment with Securitas USA.

2.3     Non-Solicitation: Employee agrees that, during Employee's employment, and for one (1) year following Employee's last date of employment with Securitas USA USA [sic], Employee will not:

a)      engage in any conduct or communication, directly or indirectly, designed or intended to induce any Securitas USA customer/ client or potential client that Employee serviced or solicited USA, to discontinue using Securitas USA's services or to employ the services of a security provider other than Securitas USA; and

b)      engage in any conduct or communications, directly or indirectly, designed or intended to induce any Securitas USA customer/ client or potential client that Employee serviced or solicited within a fifty (50) mile radius of the office in which Employee was based during his/her employment with Securitas USA to discontinue or to employ the services of a security provider other than Securitas USA; and

     . . . .

Doc. 1 at 24.

On August 14, 2011, approximately seventeen months after Defendant

signed the Agreement, Defendant informed Ed Eldridge, Vice President of Human

Resources, and Louis Sturdivant, Area Vice President, of his intent to resign "to move onto the next chapter of [his] life." *Id.* at 9.  Defendant worked for two more weeks, until August 26, 2011.  *Id.*  Thereafter, Defendant obtained employment with Security Management of South Carolina ("Security Management"), which Plaintiff contends is a direct competitor.  *Id.*  Plaintiff further contends that Defendant violated the Agreement by providing security services within a fifty mile radius of its Huntsville branch office and by soliciting and servicing Plaintiff's customers.  *Id.* at 9-10.  Specifically, Plaintiff contends that Defendant solicited and began servicing Yutaka, which led Yutaka to cancel its contract with Plaintiff.

Although Security Management terminated Defendant in November or December, 2011, Defendant continues to provide security services to Plaintiff's clients through a company Defendant created.  *Id.* at 10.  In addition to Yutaka, Defendant started servicing HTP around January 2012.  *Id.*  Additionally, Nicholas, also a client of Plaintiff's that Defendant serviced during his last year with Plaintiff, cancelled its contract with Plaintiff on March 11, 2012, and indicated its intent to use Defendant's company.  *Id.*

Plaintiff contends that Defendant violated the Agreement "[b]y providing security services within a 50-mile radius of Securitas' office in Huntsville,

Alabama, [and] by soliciting and serving the same customers of Securitas that he had previously serviced for Securitas during the last twelve months of his employment with Securitas . . . ."  Doc. 1, at 11.  Moreover, Plaintiff contends that it has suffered and will continue to suffer immediate irreparable harm to its business interests, customer relationships, and goodwill if Defendant is not enjoined from breaching the Agreement.  *Id.*

## 2.    ANALYSIS

Federal Rule of Civil Procedure 65 sets forth the applicable restrictions on this court's ability to grant a preliminary injunction or temporary restraining order. Specifically, "the four factors to be considered in determining whether temporary restraining or preliminary injunctive relief is to be granted, . . . are whether the movant has established: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).  Additionally, "[c]ontrolling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion." *Id*.

### a.    Likelihood of Success on the Merits

Defendant challenges the likelihood of success prong on two grounds: (1) that the Agreement is void for lack of consideration and (2) that non-compete agreements are disfavored as restraints on trade.  Doc. 21 at 7-8.  As it relates to the consideration argument, as a general rule, "[a]n employer may obtain a covenant not-to-compete *after* the employee begins work, and the covenant may be based merely on continuation of employment after the covenant is signed by the employee."  *Affiliated Paper Comp., Inc., v. Hughes*, 667 F. Supp. 1436, 1447 (N.D. Ala. 1987) (emphasis in original) (citing *Daughtry v. Capital Cas. Co., Inc.*, 285 Ala. 89 (1969)).  Here, though, Defendant contends that Plaintiff never informed him that his continued employment or any bonus, promotion, or advancement depended on his signing of the Agreement.  Doc. 21 at 7.  However, Defendant's attempt to distinguish *Affiliated Paper and Daughtry* are unavailing because the Agreement states explicitly that "[i]n consideration for Securitas USA's agreement to employ Employee, and in consideration for Employee's receipt and use of Securitas USA's confidential information and/or trade secrets, Employee acknowledges and agrees to the following [Agreement]."  Doc. 1 at 32.  This language placed Defendant on notice that his continued employment depended on whether he signed the Agreement and places the facts here squarely

in line with *Affiliated Paper and Daughtry*.  Significantly, Defendant received the

Agreement by email and had sufficient time to "read it, review it, [and] ask any

questions." Tr. 17.  In other words, by signing the Agreement, Defendant agreed to

its terms in exchange for continued employment.  Therefore, the Agreement is not

void for lack of consideration.

As to Defendant's contentions that non-compete agreements are generally

disfavored, *see Clark v. Liberty Nat. Life Ins. Co.*, 592 So. 2d 564, 565 (Ala.

1992), Defendant overlooks that under Alabama law, "one who is employed as an

agent, servant or employee may agree with his employer to refrain from carrying

on or engaging in a similar business and from soliciting old customers of such

employer within a specified county, city or part thereof so long as the . . .

employer carries on a like business therein." ALA. CODE 1975 § 8-1-1(b) (1975).

Moreover, courts will enforce a non-compete agreement that fits within section 8-

1-1(b) if: (1) the employer has a protectable interest; (2) the restriction is

reasonably related to that interest; (3) the restriction is reasonable in time and

place; and (4) the restriction imposes no undue hardship on the employee.  *Clark*,

592 So. 2d at 565.  All four conditions are present in this case.

### i.    Plaintiff Has a Protectable Interest

"In order to have a protectable interest, the employer must possess 'a

substantial right in its business sufficiently unique to warrant the type of protection contemplated by [a] noncompetition agreement.'" *DeVoe v. Cheatham*, 413 So. 2d 1141, 1142 (Ala. 1982) (quoting *Cullman Broad. Co. v. Bosley*, 373 So. 2d 830 (1979)).  To justify post-employment restraint, the employer must have a "legitimate interest in restraining the employee from appropriating valuable trade information and *customer relationships* to which he has had access in the course of his employment." *James S. Kemper & Co. Southeast, Inc., v. Cox & Associates*, 434 So. 2d 1380, 1384 (Ala. 1983) (emphasis in original). Additionally, if the "employee is in a position to gain confidential information, access to secret lists, or to develop a close relationship with clients, the employer may have a protectable interest." *Id.* (quoting *Devoe*, 413 So. 2d at 1143).

Defendant seeks to overcome Plaintiff's contention that it has "protectable interests in its confidential information, customer relationships, and customer goodwill," doc. 2 at 10, by asserting that Plaintiff did not specify the exact trade secret or business information Defendant misappropriated and that he had no "overwhelming hold on the goodwill of [Plaintiff's] business or its clients," doc. 21, at 9-10.  However, this argument overlooks critical facts.  First, Defendant admits that as Branch Manager his responsibilities included seeking new business and building close customer relationships.  Doc. 21 at 2.  In fact, to support

Defendant in this endeavor, Plaintiff contends it invested significant amounts:

"[O]ver five years, [Defendant] spent over $80,000 taking clients to football

games . . . So yes, [Plaintiff] spent a lot of money and invested a lot in [Defendant]

to get close to customers." Tr. 15-15.  This investment allowed Defendant to gain

access to and build relationships with key individuals at Plaintiff's expense –

business contacts that Defendant is likely using in his new venture.  Indeed, it is

difficult for Defendant to contend he did not have an "overwhelming hold" on

Plaintiff's clients, while also contending that Yutaka, HTPG, and Nichols reached

out to him for security services without any prompting or solicitation.  Doc. 21 at

5-6.  That these companies knew Defendant well enough to seek out his

company's services without any solicitation supports Plaintiff's assertion that

Defendant established close customer relationships with the clients he serviced

while working for Plaintiff.

Second, Defendant's contentions overlook that, as Stafford testified,

Defendant had "100 percent access to all [Plaintiff's] proprietary information . . . .

He had access to all of the differentiators that [Plaintiff] use[s] as a company to

separate itself from [its] competitors.  So, he had, you know, intellectual property

and intelligence on how to play against just not [Plaintiff's] competitors but if you

become a former employee, on how to compete against us." Tr. 16.  Additionally,

Stafford contends that Defendant had access to information on the pay rates, bill rates, the markup on services, the profitability on the accounts, and the special requirements of each client. *Id*. In other words, Defendant had access to valuable information that gave Plaintiff its competitive advantage. Defendant's ability to use this information to compete against Plaintiff places Plaintiff at a competitive disadvantage. Therefore, the court finds that Plaintiff has presented sufficient evidence to show a legitimate interest in protecting its clients and proprietary business information.

### ii.   The Restriction is Reasonably Related to Plaintiff's Interest

The restrictions Plaintiff imposed are reasonably related to its interest. Even though "Securitas's core business is providing uniformed guard services . . . as well as electronic surveillance camera systems . . . ," Tr. 13, the Agreement does not prohibit Defendant from obtaining employment in the security industry. Rather, Defendant "may be employed with other security companies after termination of [his] employment with [Plaintiff]," doc. 1 at 24, so long as he does not pursue clients that he serviced or solicited within the last year of his employment or within a fifty mile radius of Plaintiff's Huntsville office. Therefore, the restriction is reasonably related to Plaintiff's interest in the security industry and protecting its customer relationships and proprietary information in

"a relationship-built business."  Tr. 19.

### iii.    The Restriction is Reasonable in Time and Place

The restriction here is for one-year and "there can be no doubt that a one

year period for the restriction is reasonable under Alabama law."  *Affiliated Paper*

*Company*, 667 F. Supp. at 1447.  In fact, the Alabama Supreme Court has held that

"there can be no doubt that a two-year period for the restriction is reasonable."

*James S. Kemper & Co. Southeast, Inc., v. Cox & Associates*, 434 So. 2d 1380,

1384 (Ala. 1983); *see also Rush v. Newsom Exterminators Inc.*, 261 Ala. 610

(1954) ("It would hardly be contended that the period of two years was

unreasonable as to time.").  Therefore, Defendant has no credible basis to

challenge the one-year limitation, especially since the restriction has business

justification, i.e., to give Plaintiff "one year to get a new manager in place, get

close to the customer and establish at least the same level of service if not a higher

level of service."  Tr. 19.

As to the geographic scope, the Agreement prohibits Defendant from

servicing companies within a fifty mile radius of Plaintiff's Huntsville branch.

Defendant asserts that the Agreement is unreasonable because the "extremely

broad restrictions and the overlapping territories of the security providers in North

Alabama, the non-compete agreement renders [Plaintiff] virtually unemployable to most security providers for hundreds of miles around." Doc. 21, at 12. Defendant contends that because he cannot work for "potential clients" within a fifty mile range from Plaintiff's Madison, Alabama office, it is almost certain that he would be unable to find an employer that satisfies all of the requirements of the Agreement. *Id.* Defendant's contentions are unavailing especially since section 8-1-1(b)'s limitation on territory restrictions "was held not to be limited to the boundary lines of Alabama." *Clark*, 592 So. 2d at 566. Moreover, Alabama courts have held as valid restrictions covering two states. *See Affiliated Paper Company,* 667 F. Supp. at 1447 (N.D. Ala. 1987) ("The restrictions in the covenant reasonably relate to the protection of Redstone Paper Co.'s interest in its trade area in Alabama and Tennessee."). Thus, the territory of a covenant not to compete may properly include part of Alabama, all of Alabama, or more territory than the state of Alabama depending on the circumstances. *James S. Kemper & Co. Southeast, Inc., v. Cox & Associates*, 434 So. 2d 1380, 1384 (Ala. 1983) (citing *Parker v. Ebsco Industries, Inc.*, 209 So. 2d 383 (Ala. 1968).

Here, Plaintiff restricts Defendant only from competing and soliciting clients or potential clients in "a fifty (50) mile radius of the office in which Employee was based during his/her employment with Securitas USA." Doc. 1 at

24.  Because Alabama courts have held that the territory of a non-compete agreement can include "part of Alabama [or] all of Alabama," *Clark*, 592 So. 2d at 566, the fifty mile restriction imposed on Defendant is reasonable and is sufficiently limited to Plaintiff's clients in the territory Defendant serviced during his employment.  Additionally, the restriction is reasonable considering Plaintiff conducts business in multiple states and yet only restricted Defendant in a fifty mile radius of its Huntsville Office.  Tr. 13.  Accordingly, the court finds that the Agreement is reasonable in time and place.

### iv.    The Restriction Imposes No Undue Hardship on the Defendant.

Defendant contends that he is burdened by the Agreement because for approximately the last ten years he has only worked in the security business and starting a new occupation is unduly burdensome and would "hinder his career path" given that he has no other specialized skills.  Doc. 21 at 12.  Alabama courts have found hardship where the non-compete agreement:

> imposes on the employee . . . greater restraint than is necessary to secure to the business of the employer . . . [its legitimate] protection, regard being had to the injury which may result to the public from restraining the breach of the covenant in the loss of the employee's service and skill and the danger of his becoming a charge upon the public.

*Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1089 (11th Cir. 1990).

Additionally, Alabama courts have generally found undue hardship when the enforcement of the restraint would have "prohibited a worker from engaging in the only trade that he knew and could rely upon to support his dependents." *Id.* (citing *Chavers v. Copy Products of Mobile*, 519 So. 2d 942, 945 (Ala. 1988)). Alternatively, Alabama courts have declined to find undue hardship where the employee's "retention of alternative means of support was evident." *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1089 (11th Cir. 1990).  This is precisely the case here.

        As stated previously, Defendant is not prohibited from working in the security industry; rather for a one-year period, he is restricted from doing so within a fifty mile radius of Plaintiff's Huntsville office to clients Defendant serviced during his last year with Plaintiff.  Doc. 2 at 10.  Critically, during the one-year restriction period, Defendant is free to carry on his trade outside the fifty mile radius.  Therefore, the Agreement does not force Defendant to start a new occupation or "impose on [Defendant] greater restraint than is reasonably necessary." *Clark*, 592 So. 2d at 566.  Moreover, Defendant's contentions that the Agreement restricts him from engaging in his trade are belied by his exit interview in which he stated that he had no previous security experience, Tr. 55, and conveyed that he had no intentions in "any shape or form in moving forward in the

security contract world," Plaintiff's Exhibit 2.  Indeed, the evidence showed that Defendant worked as a human resources professional prior to his promotion to Branch Manager.  Tr. 14.  Thus, even if Defendant cannot find a job in the security industry because of the restrictions imposed by the Agreement, the court finds it difficult to believe that Defendant's will be unable to support his family.  This is especially the case here since Defendant has conveyed to Plaintiff, in response to this lawsuit, that he plans to close his security business and accept a position with St. Vincent's.  Tr. 21. Therefore, the court finds that the Agreement does not place an undue burden on Defendant.

Accordingly, the court finds that the Agreement meets all four elements necessary to overcome the general disfavor for non-competes and to fit squarely within section 8-1-1(b).  Additionally, a jury may likely find that Defendant's behavior – i.e. – admitting he now services Yutaka, HTP, and Nichols, doc. 21 at 5-6, and that he plans to solicit Southern Company, all of whom are clients or former clients of Plaintiff's, *id.* at 4, – violated the terms of the Agreement.  Thus, it is likely that Plaintiff will succeed on its breach of contract claim,[1] and

---

[1]Plaintiff is also likely to succeed on its tortious interference claim, which requires Plaintiff to show: "(1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference." *Century 21 Academy Realty, Inc., v. Breland*, 571 So. 2d 296, 297 (Ala. 1990).

consequently satisfies factor one of the four factors.

### b. *Irreparable Harm*

The next factor under Rule 65 is irreparable injury.  *Schiavo*, 403 F.3d at

1225.  Alabama courts "recognize a *rebuttable inference* of irreparable injury in

cases where a former employee salesperson is actively competing with his former

employer in the same geographic area in violation of a noncompetition

agreement[.]"  *Ormco Corp. v. Johns*, 869 So. 2d 1109, 1117 (Ala. 2003)

(emphasis in original).  "[T]he employee can rebut this inference by producing

evidence that the competition of the employee will not irreparably injure the

employer."  *Id.* at 1119.  Additionally, "[a]n injury is 'irreparable' only if it cannot

be undone through monetary remedies."  *Ferrero v. Associated Materials Inc.*, 923

---

Defendant contends that Plaintiff is unlikely to prevail on this claim because (1) Plaintiff's clients left voluntarily based on Plaintiff's poor quality of service, rather than because of Defendant's interference and (2) Plaintiff incurred no damage that it can attribute to Defendant since the clients left on their own. Doc. 21 at 14.  The court disagrees and finds instead that Plaintiff will likely succeed on its claim because it is undisputed that Plaintiff had a contractual relationship with Yutaka, HTP, and Nichols, and with its current clients that Defendant is soliciting.  Docs. 2 & 21.  It is also undisputed that Defendant serviced these three accounts during his last year of employment with Plaintiff and, consequently, knew of Plaintiff's relationship with these three entities.  *Id.*  Moreover, although Defendant contends that he did not solicit these clients and that they left Plaintiff voluntarily, Defendant overlooks that he still interfered by servicing these clients, in violation of the Agreement.  In doing so, Defendant interfered with Plaintiff's one-year window to hire a new manager to reestablish relationships with clients after Defendant's employment ended.  Additionally, due to Defendant's actions, Plaintiff contends it lost at least $65,000 in profits and continues to suffer damages in light of Defendant's ongoing solicitation of its clients.  Accordingly, Plaintiff has presented sufficient facts to establish also that it likely will succeed on its tortious interference claim.

F.2d 1441, 1449 (11th Cir. 1991).  The plaintiff seeking an injunction must prove

"a real and immediate – as opposed to merely conjectural or hypothetical – threat

of *future* injury."  *Church v. City of Huntsville*, 30 F. 3d 1332, 1337 (11th Cir.

1994).

   Defendant challenges Plaintiff's contention that it "will continue to be

significantly and irreparably injured" without injunctive relief, doc. 2 at 14, by

asserting that he is not the reason Yutaka, HTP, and Nichols ended their services

with Plaintiff and that Plaintiff failed to allege misuse of the confidential and trade

secrets.  Doc. 21 at 16.  However, in making these assertions, Defendant ignores

that the Agreement included both a non-solicitation and a non-competition clause.

Doc. 1 at 24.  Therefore, barring an injunction, Plaintiff will, in fact, continue to

suffer irreparable harm due to Defendant "competing with his former employer in

the same geographic area in violation of a noncompetition agreement[.]" *See*

*Ormco*, 869 So. 2d at 1117.  Additionally, the cost to Plaintiff to lose an eighteen

year customer like Nichols is a loss monetary damages will not fully remedy

because the security industry is a relationship-business that requires years to

cultivate continuous business relationships.  Thus, the court finds that Plaintiff

will likely suffer irreparable harm if injunctive relief is not granted.

### c. Balancing of Harms to Movant and Non-Movant

The third factor under Rule 65 is a showing that the threatened injury outweighs the harm the injunctive relief would inflict. *Schiavo*, 403 F.3d at 1225-26.  Plaintiff alleges the balance of hardships militates heavily in favor of granting the injunctive relief because if Defendant is not "enjoined from violating the Agreement, [Plaintiff] faces the prospect of irreparable harm to its customers relationships and goodwill."  Doc. 2 at 16.  Conversely, Defendant contends that he will endure hardship by rendering him unemployable for hundreds of miles and that, in contrast, "[i]f an injunction is issued against [Defendant], [Plaintiff] will stand to loose [sic] only a small portion of its many thousands clients.  However, [Defendant] will loose [sic] all of his."  Doc. 21 at 18.  The court recognizes that an injunction will render Defendant unable to service the three former clients of Plaintiff's and any others he has lined up as clients.  However, that does not mean Defendant will be unable to provide for his family.  As stated previously, the Agreement limits Defendant from working within a fifty mile radius from Plaintiff's Huntsville office for only one-year, doc. 1 at 23-24, which is far different from rendering him "unemployable for hundreds of miles."  To the contrary, Defendant is free to develop his own security business – he simply has to do so in a city outside Huntsville and with clients that have no prior relationship

derived from Defendant's employment with Plaintiff. This is hardly unreasonable in light of the access Defendant had to Plaintiff's trade secrets, the dollars Plaintiff invested to help him cultivate business, and the fact that Defendant could have refused to sign the Agreement and resigned instead from Plaintiff and thereafter obtain other employment free and clear of the restrictions at issue.

Significantly, Defendant "was the face of Securitas. He's the one that met with the customers on a weekly basis . . . So when managers have full access to all [the] trade secrets, [the] proprietary information, and they have the relationships built as well, when they leave and try to do what [Defendant] has done, is start his own security firm . . . [,]" Tr. 18-19, they have a significant competitive advantage. Thus, absent injunctive relief, Defendant can take the relationships he established while working for Plaintiff and use them for his benefit, without giving Plaintiff sufficient time to establish a new manager, rebuild relationships with its clients, and establish the same level of service. *Id.* at 19. Accordingly, the harm that Plaintiff may endure by losing customer goodwill outweighs the limited harm to Defendant from the narrow restrictions imposed by the Agreement.

### d. Public Interest

The final factor requires Plaintiff to show that the relief it seeks will not

disserve the public interest.  *Schiavo*, 403 F.3d at 1226.  To support this element,

Plaintiff cites to *Digitel Corp. v. Deltacom, Inc*., 953 F. Supp. 1486 (M.D. Ala.

1996), and contends that an injunction will ensure that "the public interest in

ensuring fair competition and enforcing valid contracts will be vindicated."  Doc.

2 at 16.  Specifically,

> [t]he public interest factor is an elusive one in that opposing parties
> generally can make reasonable arguments that the public interest favors
> each side of a dispute. The court agrees with [plaintiff] that "the law
> favors active but fair competition." *Combined Ins. Co. v. Investors
> Consol. Ins. Co.,* 499 F.Supp. 484, 488 (E.D.N.C.1980). While
> [plaintiff's] former customers have an interest in access to a free and
> open market, that market cannot stand free and open in the face of
> conduct which may be deemed unfair. Accordingly, the court finds that
> the public interest will not be harmed by the issuance of an injunction
> against [defendants].

*Digitel*, 953 F. Supp. at 1498.   Additionally, Plaintiff contends "[c]ompanies have

a legitimate public interest in keeping certain information confidential and

maintaining their clientele." *Unisource Worldwide, Inc. v. South Central Alabama

Supply, LLC*, 199 F. Supp. 2d 1194, 1215.  Defendant disagrees and maintains that

*Digitel* is distinguishable because, here, Plaintiff's clients left Plaintiff voluntarily,

whereas in *Digitel*, the former employees were "privy to confidential information

and made affirmative efforts to thwart or divest business away from their old

employers by making direct and purposeful solicitations."  Doc. 21 at 17.  Thus,

Defendant asserts it is in the "public's interest to promote and nurture fair and active competition." *Id.*

Defendant's contentions are unavailing for several reasons. First, as to Defendant's assertions that he was not privy to confidential information, the unrebutted evidence at the hearing showed that Defendant had unrestricted access to Plaintiff's proprietary information. Tr. 16. Second, Defendant's contention that he did not solicit Plaintiff's clients again ignores that he signed a non-solicitation *and* a non-competition agreement. Therefore, even if he did not solicit Plaintiff's clients, he is still violating the Agreement by competing against Plaintiff. Moreover, while competition is beneficial to the general public, Plaintiff should, however, have the peace of mind that a former employee will not strip from its grasp customer relationships and valuable trade secrets it sought to protect through a valid non-competition agreement. Thus, granting an injunctive relief will not disserve the public interest, especially, when, as here, the restrictions are reasonable in time and place and Defendant can still freely compete to a large extent against Plaintiff.

## V. CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for a Temporary Restraining Order and request for injunctive relief is due to be

**GRANTED** and Defendant's Motion to dismiss is **DENIED**.

**DONE** the 26th day of April, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE